UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-MJ-03455-Elfenbein

FILED BY __TS__ D.C.

Jul 17, 2024

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - Miami, FL

UNITED STATES OF AMERICA

v.

FAUSTO R. VILLAR,

    **Defendant.**
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek M. Maynard)?   No.

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)?   No.

3. Did this matter involve the participation of or consultation with now Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023?   No.

4. Did this matter involve the participation of or consultation now Magistrate Judge Marty Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024?   No.

                                        Respectfully submitted,

                                        MARKENZY LAPOINTE
                                        UNITED STATES ATTORNEY

By:   *Abbie D. Waxman*
                                        Abbie D. Waxman
                                        Assistant United States Attorney
                                        Florida Bar No.: 109315
                                        U.S. Attorney's Office
                                        99 N.E. 4th Street, Miami, FL 33132
                                        Tel: (305) 961-9240
                                        Abbie.Waxman@usdoj.gov

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>Fausto R. Villar,<br><br>*Defendant.* | )<br>)<br>) Case No. 24-MJ-03455-Elfenbein<br>)<br>)<br>) |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __November 2023 through July 2024__ in the county of __Miami-Dade__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1958 | Murder For Hire |
| 18 U.S.C. § 2261A | Stalking |
| 18 U.S.C. § 924(c) | Possession of a Firearm in Furtherance of a Crime of Violence |
| 18 U.S.C. § 1503 | Obstruction of Justice |
| 18 U.S.C. § 2 | Aiding and Abetting |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

Badge 100722

*Complainant's signature*

Conor Goepel, Special Agent FBI
*Printed name and title*

Attested to by the Applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by __Face Time__

Date: __July 17, 2024__

*Judge's signature*

City and state: __Miami, Florida__   Honorable Marty Fulgueira Elfenbein, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

Your Affiant, Conor S. Goepel, being duly sworn, deposes and states as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent for the Federal Bureau of Investigation ("FBI") currently assigned to the Violent Crimes/Fugitive Task Force in the Miami Division. I have been an FBI Special Agent since September 2021 and have been assigned to the Miami Division since February 2022. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations of, and to make arrests for, federal offenses. As a Special Agent for the FBI, my duties involve the investigation of a variety of violations of federal offenses, including, but not limited to, bank robberies, Hobbs Act robberies, extortion, and murder for hire.

2. I am currently a member of the South Florida Violent Crime Task Force. As part of my professional duties and responsibilities, I have become familiar with the investigative methods and enforcement of violent crimes pertaining to state and federal laws. I have also become versed in methodologies and practices employed by individuals and groups who commit violent crimes.

3. The facts contained in this Affidavit are based on my personal knowledge and information provided to me by other law enforcement officers. This Affidavit is being submitted for the limited purpose of establishing probable cause for the proposed complaint, and as such does not contain every fact known to me. I respectfully submit that based upon the facts presented below, that there is probable cause to believe that Fausto R. VILLAR committed the offenses of Murder for Hire, in violation of Title 18, United States Code, Section 1958; Stalking, in Violation of Title 18, United States Code, Section 2261A(2); Possession of a Firearm in Furtherance of a

1

Crime of Violence, in violation of Title 18, United States Code, Section 924(c); and Obstruction of Justice, in violation of Title 18, United States Code, Section 1503 and 2.

## PROBABLE CAUSE

### *Background*

4. Since July of 2022, law enforcement has been investigating Sergio Pino for orchestrating multiple contracts to kill his estranged wife ("Victim 1") and her sister, both residents of Miami-Dade County. Events surrounding the contracts to kill Victim 1 include, but are not limited to, more than one attempt to poison Victim 1, two separate vehicle arsons at Victim 1's sister's residence, a hit and run at Victim 1's residence in Pinecrest, Florida (hereinafter, "Victim 1's Residence"), the mailing of a threatening letter to Victim 1, and an assault on Victim 1 and the daughter of Pino and Victim 1 ("Victim 2") with a firearm at Victim 1's Residence, all occurring since 2019 through June 2024. Law enforcement also discovered that Victim 1 had been poisoned with fentanyl through the tampering of her prescribed medication.

### *The First Murder for Hire Effort*

5. As a result of this investigation law enforcement secured the arrest of Bayron BENNETT, Jerren HOWARD, Michael DULFO, and Edner ETIENNE (hereinafter, "the HOWARD Group"), for stalking, arson, and use of interstate facilities in aid of racketeering. *See* Case Numbers 24-mj-02454-Reid, 24- mj-02460-Reid, and 24-CR-20110-Gayles. As a result of its investigation, law enforcement learned that Pino contracted the HOWARD Group to conduct the arsons and hit and run against Victim 1. Law enforcement also learned that Pino sought to secure fentanyl from members of the HOWARD Group in furtherance of his efforts against Victim 1. Moreover, law enforcement learned that Pino solicited a price to kill Victim 1. After the arrest of the HOWARD Group, law enforcement learned that Pino continued his murder for hire conspiracy with a new group of individuals, which became visible on June 23, 2024.

2

### *The Second Murder for Hire Effort*

6. On June 23, 2024, at approximately 8:45 am, Victim 1, departed her residence in her vehicle. At approximately 11:30 am, Victim 1 returned to her residence and momentarily idled in her driveway while she waited for the gate on the west side of the house to open. As Victim 1 began to pull into the driveway, she observed a black male individual (later identified by law enforcement as Vernon Green ("GREEN")), brandishing a firearm and running toward her vehicle. In fear for her safety, and in an attempt to get away, Victim 1 drove into her backyard, scraping the sides of her car against a tree and a fence. Victim 1 continuously honked the horn of her car as she attempted to get away. GREEN pursued on foot and ran into the backyard before he turned around and ran back toward the front of Victim 1's Residence.

7. During this time, Victim 1 and Pino's daughter, Victim 2, was inside Victim 1's Residence when she heard a loud crash and a vehicle honking. Victim 2 exited the Residence and ran toward the front of the house. As she reached the open gate, Victim 2 noticed a black pickup truck parked on the street. GREEN, coming from the back of the house, ran up behind Victim 2 and pointed a firearm at Victim 2's head. Upon GREEN's approach, Victim 2 turned around and saw GREEN as he pointed a pistol with a silver slide inches from her face. GREEN grabbed Victim 2's arm and told her to go back into the house. Victim 2 then ran back inside.

8. After Victim 2 fled, GREEN ran across the front yard of Victim 1's Residence toward the east side of the property. Moments later, GREEN turned back, ran across the yard, and entered the back passenger side of a black Dodge Ram pickup truck (the "Dodge Ram"). The Dodge Ram then rapidly departed the area, which reasonably indicates there was an additional individual, SUBJECT 2, acting as the getaway driver.

9. Victim 1's Residence is equipped with surveillance cameras affixed around the property that captured the incident. The video footage shows the series of events that took place: 1) Victim 1 arriving at her residence; 2) the Dodge Ram as it arrives and stops next to Victim 1's Residence; 3) GREEN, wearing a light-colored t-shirt, shorts, yellow-colored boots, a beanie, and a face covering, exiting the Dodge Ram's back passenger side; and 4) GREEN running up to the Victim 1 holding what appears to be a firearm in his right hand. The surveillance footage also shows: Victim 1 driving her vehicle toward the backyard, while GREEN pursuing on foot. Lastly, the video surveillance shows Victim 2 exit the residence and GREEN approaching Victim 2 from behind, pointing a firearm at her head, and grabbing her arm.

10. Law enforcement canvassed Victim 1's neighborhood and obtained video surveillance footage showing that on June 23, 2024, the Dodge Ram arrived and parked approximately one block east of Victim 1's Residence. The Dodge Ram followed closely behind a white Tesla (the "Tesla"), which continued west, passing Victim 1's Residence. The video shows the Tesla travel east, passing Victim 1's Residence less than two minutes later. The Tesla then continued east, passing the Dodge Ram, which then immediately departed as they both turned north away from Victim 1's Residence. The video then shows the Dodge Ram return to the same spot where it had previously parked, where it did not depart until approximately 11:30 am, when Victim 1 returned to home.

11. In my training and experience, it is common for criminals to use multiple cars to commit crimes to carry multiple co-conspirators. In this case, the close proximity of the white Tesla to the Dodge Ram over time, distance, and change of direction indicates a direct relationship between the occupants of the Dodge Ram and the white Tesla.

### *Identification and Movement of Vehicles*

12. A further analysis of surveillance video obtained from the vicinity of Victim 1's Residence revealed Florida license plate DI0RI affixed to the rear of the Tesla. Information obtained from the Florida Department of Highway Safety and Motor Vehicles, driver and vehicle information database ("DAVID") discloses that the license plate DI0RI is registered to Diori BARNARD. A database search showed BARNARD's registered residential address to be located in Miami, Florida.

13. On June 24, 2024, law enforcement conducted surveillance of BARNARD's residence. Parked outside the house was a white Chevrolet Tahoe, bearing Florida license plate BN50WL. A DAVID query revealed the Tahoe is registered to BARNARD. Upon reviewing license plate reader ("LPR") images, on May 3, 2024, an LPR collected an image of BARNARD's residence that captured the white Tahoe next to a black Dodge Ram with chrome bumpers, similar in description to the Dodge Ram seen around Victim 1's Residence on June 23, 2024. In this image, an after-market LED light is visible on the Dodge Ram's front bumper.

14. On the afternoon of June 24, 2024, FBI surveillance recovered the Dodge Ram, with Florida license plate BP16UV, abandoned in the vicinity of SW 70th Avenue and SW 80th Street nearby Victim 1's Residence. Law enforcement observed an after-market LED light affixed to the Dodge Ram's front bumper, in the same place as the one seen on the Dodge Ram at BARNARD's residence. The vehicle identification number ("VIN") associated with the Dodge Ram, 1C6RREBG1MN533057, is reported stolen. Based on my training and experience, perpetrators of violent crimes often use a stolen vehicle to commit the crime, and an additional vehicle, in this case the white Tesla, to attempt to avoid detection and escape the scene of the crime.

15. Law enforcement queried for stolen vehicles and received an Orange County Sheriff's Department (FL) report stating that the Dodge Ram was stolen in the vicinity of Orlando, Florida, in the early morning hours of March 31, 2024. Also contained in that report, "S.H.," the owner of the Dodge Ram, stated the vehicle can be differentiated from similar models, by an LED strobe light affixed to the front bumper.

16. Florida License Plate BP16UV, also reported stolen, is associated with a 2013 orange Toyota Corolla.[1] Law enforcement located and interviewed, "A.O.," the owner associated with Florida tag BP16UV. Upon locating A.O., his vehicle, a blue Dodge Ram, was parked in the lot with Florida license plate 85BMPA affixed to the rear. A.O. acknowledged the current plate on his truck was not his and he had no knowledge of how that plate got on his vehicle. A.O. told law enforcement that he had recently visited a Walmart. Law enforcement photographed and seized the plate for processing. In my training and experience, perpetrators of crimes involving vehicles will try to avoid detection by using stolen vehicles and switching the license plate affixed to a vehicle used for criminal purposes to conceal the vehicle's identity.

17. An LPR review of Florida plate 85BMPA revealed that on June 19, 2024, at 8:41 pm, A.O.'s blue Dodge Ram was parked at a Walmart in Miami, Florida. An LPR review also documented a Mazda C-30, parked in the same Walmart at 8:42 pm. A review of the Walmart surveillance footage showed the white Tesla driving with the Mazda C-30 and pulling up to the blue Dodge Ram. Based on the driving pattern, parking location, and time spent in the parking lot without entering the store, it is reasonable to believe that the occupants of the white Tesla and

---

[1] It should be noted that during the interview of the owners of the blue Dodge Ram and orange Toyota Corolla, it was discovered that they have two license plates (BP16UV and BP13UV) that were improperly affixed to their vehicles.

occupants of the Mazda C-30 worked together to steal a license plate off of a similar make, model, and color vehicle in order to place the mis-attributable license plate on the Dodge Ram.

18.     On June 24, 2024, FBI located and seized the white Tesla with the license plate "DI0RI" affixed to the rear of the vehicle. A sealed federal search warrant was obtained, and on June 25, 2024, law enforcement extracted footage recorded by the Tesla's onboard computer system, which included multiple cameras capturing exterior footage. Footage revealed the white Tesla parked in the driveway of BARNARD's residence parked next to the black Dodge Ram matching the description of the Dodge Ram used in the Target Offense. The footage also showed Clementa Johnson ("JOHNSON") as he was getting in and out of the passenger side of the Dodge Ram. Footage also revealed JOHNSON entering the driver's side and departing in a light-colored Mazda C-30.

19.     On or about June 24, 2024, BARNARD was arrested pursuant to a criminal complaint. *See* Case No. 24-mj-03234-Reid.

### *Johnson and the Mazda C-30*

20.     Seminole Hard Rock Casino ("Hard Rock Casino") advised law enforcement that JOHNSON had an active player account with the casino. Further, surveillance footage from Hard Rock Casino shows that on June 21, 2024, at 8:40 am. JOHNSON arrived alone in a light-colored Mazda C-30, bearing Florida license plate 95BKCV (the "Mazda C-30"). The Mazda C-30's VIN is 3MVDMBDM1RM648633 and is the vehicle is registered to P.V. Holding Corp, a car rental company. The Hard Rock Casino surveillance footage also shows that JOHNSON departed the casino as the driver and sole occupant of the Mazda C-30.

21.     Records check at P.V. Holding Corp, revealed that the Mazda C-30 was rented on June 14, 2024, to Diori BARNARD. This vehicle was scheduled to be returned on June 21, 2024, but was not returned until June 28, 2024.

22.     A review of LPR database checks for the Mazda C-30 license plate revealed its location on June 21, 2024, at 7:56:52 pm, in the vicinity of Victim 1's residence. The Mazda C-30 was immediately behind the stolen Dodge Ram which hit the LPR at 7:56:57 pm. This location is approximately 1.3 miles south of Victim 1's Residence.

23.     Additional LPR records indicate that on June 22, 2024, the Mazda C-30 is recorded by the Monroe County Sheriff's Office, Key Largo South LPR, located immediately over the Route 1 bridge onto Key Largo. In an interview with Victim 1, law enforcement learned that she was in Key Largo on the evening of June 22, 2024, with a reservation to stay at Baker's Cay Resort ("Resort"). On June 28, 2024, pursuant to a sealed federal search warrant of the Dodge Ram law enforcement searched the black Dodge Ram and recovered a Resort valet pass with an arrival date of June 22, 2024, and a departure date of June 26, 2024. Law enforcement reviewed security footage provided by the Resort and observed the Dodge Ram and BARNARD's white Tahoe follow Victim 1 into the Resort's parking area through the Resort's front gate.

24.     On June 28, 2024, pursuant to a sealed federal search warrant, law enforcement obtained BARNARD's historical cell site data from his provider. Upon review of these records, law enforcement learned that BARNARD called JOHNSON on the evening of June 22, 2024, while in the vicinity of Victim 1's Residence. On June 23, 2024, prior to driving the white Tesla to Victim 1's Residence, BARNARD contacted JOHNSON. BARNARD again contacted JOHNSON upon the white Tesla and the Dodge Ram's arrival outside of Victim 1's Residence. JOHNSON, BARNARD, and additional unidentified phone numbers then appear to join a group

phone call shortly thereafter while the Dodge Ram and the white Tesla are down the street from Victim 1's Residence. Based on my training and experience, I believe that the timing of this phone call in conjunction with the sequence of events as observed on residential surveillance footage indicates that the individuals inside the vehicles were coordinating their eventual attack on Victim 1. In my training and experience, this coordination and the dependence upon cellular devices to communicate during the course of the murder for hire plot establishes that they conspired to use a facility of interstate or foreign commerce and did use a facility of interstate and foreign commerce to plan and execute their attack on Victims 1 and 2.

### *Arrest of JOHNSON, Identification of BIVINS, VILLAR*

25. On or about July 1, 2024, JOHNSON was arrested by law enforcement pursuant to a criminal complaint. *See* Case No. 24-mj-03324-Goodman. Law enforcement later learned the following about the plot to kill Victim 1 that led to the June 23, 2024 assault with a firearm: 1) JOHNSON was hired to murder Victim 1 by Avery BIVINS; 2) BIVINS had been asked by a male he met in prison known to him as "Cuba," to murder VICTIM 1, and Cuba was acting on behalf of Victim 1's estranged husband, Pino; 3) Cuba told BIVINS to make it look clean; 4) Cuba's real name was unknown, but it was believed that he was stocky, the owner of a roofing company, and driving a grey Dodge Ram; and 4) GREEN was the gunman. GREEN was arrested pursuant to criminal complaint. *See* Case No. 24-mj-03414-Elfenbein.

26. A law enforcement analyst reviewed Pino's historical WhatsApp call records made to and from Pino's device and isolated a call on June 21, 2024, by telephone number (786) 260-2876. Based on a law enforcement database search, subscriber information for this cellular telephone came back to Fausto Villar ("VILLAR"). VILLAR's wife is the owner of Evalution Roofing LLC and VILLAR is the registered owner of a 2024 grey Dodge Ram. VILLAR's Dodge

Ram has been photographed with an Evalution Roofing LLC magnet affixed to the side of the vehicle. Further law enforcement investigation revealed that VILLAR and BIVINS overlapped terms of imprisonment during the years 2012 - 2016 in the Florida Department of Corrections. This previously learned information that VILLAR met BIVINS while serving a prison sentence. Additionally, during the month of June 2024, VILLAR made sixteen WhatsApp calls with Pino, nine of which occurred on June 21, 2024.

27. On July 8, 2024, law enforcement obtained a sealed federal search warrant for BIVINS' person, residence, and electronic devices.

28. On Friday, July 12, 2024, law enforcement contacted BIVINS who voluntarily agreed to meet with law enforcement under the advice of counsel. Law enforcement explained that they were in possession of the above-mentioned federal search warrant.

29. Law enforcement later learned the following about the plot to kill Victim 1 that led to the June 23, 2024 assault with a firearm: 1) BIVINS knew VILLAR as "Cuba" and that they knew each other from state prison and they remained in contact after their release; 2) VILLAR contacted BIVINS in or around October or November 2023 about a wealthy man (later identified as Pino) who contracted him to kill his estranged wife (Victim 1); 3) VILLAR enlisted BIVINS to gather a group for the job; 4) according to VILLAR, Victim 1 wanted half of what Pino owned and would not settle for the offered 20 million dollars; and 5) BIVINS contacted JOHNSON to kill Victim 1. JOHNSON researched Victim 1 and Pino and explained to BIVINS how much money they possessed.

30. VILLAR and BIVINS met multiple time and BIVINS accepted the murder contract. Law enforcement learned that Pino was willing to pay $150,000 for the murder contract's completion and there would be an additional $150,000 if the contract was carried out without

detection. VILLAR also provided two cash payments of $30,000 and $45,000 up front during two separate meetings. VILLAR provided syringes and vials to use during the execution of the murder contract. BIVINS has connections to JOHNSON who brought on other individuals including BARNARD to complete the contract.

31. Law enforcement learned that VILLAR provided a deadline of June 24, 2024, to kill Victim 1, to ensure that she could not make the next divorce proceeding between her and Pino. JOHNSON and the others began stalking Victim 1 sometime after June 11, 2024. From June 19 to 23, 2024, JOHNSON and others stalked Victim 1 at several locations over multiple days. BIVINS was in consistent contact with JOHNSON throughout this period of time.

32. After the June 23, 2024, assault with a firearm, JOHNSON contacted BIVINS and stated the job was completed. BIVINS relayed this information to VILLAR. Later that day, VILLAR's cellular device used a tower that services the area of Victim 1's residence. VILLAR then contacted BIVINS explaining that he saw law enforcement presence at Victim 1's residence.

33. BIVINS met VILLAR three distinct times to collect the money syringes, and vials containing an injectable substance. A comparison of the historical cellsite data between BIVINS and VILLAR shows that they met on June 5, 2024, at approximately 7:30 pm; June 11, 2024, at approximately 8pm; and June 27, 2024, at approximately 8:15 pm.

34. After BARNARD and JOHNSON's arrests, BIVINS notified VILLAR of their arrests. VILLAR expressed that "his boy," (Pino) was worried about their arrests. VILLAR stated he would contact Pino for money to cover their legal fees. Law enforcement learned that VILLAR was using a burner telephone that they had been using to communicate since approximately June 2024.

35. On July 12, 2024, law enforcement obtained a sealed federal search warrant for one of VILLAR's cellular telephone devices that included prospective cellular data. The information obtained from this warrant provides law enforcement with live cellular tower usage of the device. Law enforcement began receiving this information on July 14, 2024.

36. On July 15, 2024, law enforcement monitored a voluntarily recorded call between BIVINS and VILLAR using their burner telephones. During the call, VILLAR impressed upon BIVINS that they needed to cease contact and lay low until "the smoke clears." VILLAR implied to BIVINS that he could not get more money from Pino because law enforcement was monitoring Pino. VILLAR instructed BIVINS to delete his Instagram, clear his phone logs, and to get rid of his burner telephone. VILLAR talks about if the first attempts on Victim 1 get connected to the attempt involved with BIVINS that they could be charged with conspiracy. VILLAR also instructed BIVINS to make sure that the arrested individuals did not give up BIVINS and VILLAR by making it seem like the robbery was a crime of opportunity. VILLAR tells BIVINS to "take care of his people" and implies he needs to keep them in line and that there will be a gift afterward for the two of them and the arrested individuals if they do so. VILLAR's solicitation that BIVINS falsely accept responsibility for a robbery, rather than a murder for hire is in accord with prior efforts by Pino and his associates to use obstructive means to advance their illicit goals through fraud and deceit. For comparison, this investigation has identified Pino's solicitation of individuals to burn his own car on September 7, 2023, shoot at his property, and provide false statements to law enforcement agents.

37. Immediately after BIVINS and VILLAR's recorded call, law enforcement monitored the pen register trap and trace associated with Pino's known cellular telephone number. Law enforcement observed a WhatsApp call between VILLAR's primary cellular device and

Pino that lasted approximately three minutes and fifteen seconds. VILLAR and Pino also exchanged WhatsApp messages during this time.

38. Through pen register trap and trace as well as toll data, law enforcement learned that throughout the course of the second murder for hire effort all subjects coordinated their efforts using cellular devices that utilized a facility of interstate or foreign commerce. For example, throughout the murder effort, data suggests there is a consistent and synchronized flow of information beginning with Pino to VILLAR. That data continues to show VILLAR contacting BIVINS who would then contact JOHNSON who then contacted GREEN, BARNARD, and others. The same synchronized flow of information can be seen in reverse back to Pino. This flow of information exists surrounding significant events correlated to attacks on Victim 1.

## CONCLUSION

39. Based upon the foregoing, I submit that there is probable cause for the proposed complaint charging VILLAR with the offenses of Murder for Hire, in violation of Title 18, United States Code, Section 1958; Stalking, in Violation of Title 18, United States Code, Section 2261A(2); Possession of a Firearm in Furtherance of a Crime of Violence, in violation of Title 18, United States Code, Section 924(c); and Obstruction of Justice, in violation of Title 18, United States Code, Section 1503 and 2.

FURTHER AFFIANT SAYETH NAUGHT.

Badge No. 100722
CONOR GOEPEL
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Attested to by the applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by Face Time this 17th day of July 2024.

HONORABLE MARTY FULGEIRA ELFENBEIN
UNITED STATES MAGISTRATE JUDGE

13